## In re Philadelphia School District

*Eugene Brazil,* for petitioner.
*Francis H. Delone, Fred Magaziner* and *Patrick Johnston,* for intervenors.

BULLOCK, *J.,* April 1, 1981—Before us is the petition of the School District of Philadelphia for leave to fund unfunded debt in the sum of $30,000,000 through the issuance of bonds, pursuant to the Local Government Unit Debt Act of July 12, 1972, P.L. 781, sec. 512, as variously amended, 53 P.S. §6780-210. On March 12, 1981 Honorable Stanley M. Greenberg directed that a hearing be held on March 24, 1981 and that his order be published. A hearing was held by this court on March 24 and 25, 1981, at which time proof of notice was submitted. The Greater Philadelphia Partnership, the Citizens Committee on Public Education in Philadelphia, and certain citizens petitioned to intervene in the case for purposes of

opposing the school district's petition; the petition to intervene was granted. It was agreed that granting the within petition would not cause the school district to exceed any statutory debt limit and that the sole issue before the court was the merits of the school district's petition pursuant to the Act of 1972, supra. Moreover, it was agreed that, pursuant to the requirements of the Philadelphia Home Rule Charter Supplement, the school district is obliged to adopt balanced budgets, i.e., budgets in which "the total amount of proposed expenditures shall not exceed the amount of funds available for School District purposes."

The Act of 1972, supra, provides in part at 53 P.S. §6780-210:

"(a) Whenever the governing body of a local government unit shall be of the opinion that it has outstanding unfunded debt, it may, by petition to the court of common pleas or, if located in two counties, of either county, setting forth the facts, request approval for the issuance of bonds or notes to fund the unfunded debt. After hearing, on such notice to the local government unit and its taxpayers as the court may prescribe, the court shall make an order granting authority to fund all or a part of such unfunded debt if the court shall find that (1) such unfunded debt is a lawful obligation of the local government unit, (2) that there has been an unforeseeable decline in revenues, or that taxes levied have not produced the revenues anticipated or that it was not reasonable to foresee such obligation, (3) that paying such debt by curtailing municipal services will be dangerous to the public health, safety or education, and (4) that it is not feasible or not in the public interest to levy additional taxes in the current fiscal year." (Numbers added.)

The basic purpose of this act is clear. It authorizes the school district to borrow in case of unforeseen fiscal emergencies where there is no other feasible solution to the problem. The court's role in this situation is a very limited one. We have no power to approach the situation as an equitable matter. Our role is simply one of fact-finding and the application of the above statute to the facts which we find.

On the basis of the evidence presented before us, it is our conclusion that the school district has met its burden to establish requirements (1), (3) and (4) of the above act, but that it has failed to establish requirement (2).

We do not agree with the contention of the intervenors that the unfunded debt, which the school district seeks to pay, is unlawful. Their contention is based on the proposition that whatever debts the school district seeks to pay with the money it proposes to borrow are unlawful, solely because the school district's current budget is unbalanced and, therefore, unlawful. The evidence was uncontradicted that the school district seeks to borrow for the purpose of paying the normal obligations such an entity incurs within the scope of its carrying out its lawful function. The proposition urged by the intervenors would, if effectuated, have the drastic result of permitting doubt to be raised as to the legality of a myriad of otherwise legal obligations, including salaries, payment for supplies, etc., simply through an allegation that the school district's budget was unbalanced.

We are convinced that the school district has met its burden of establishing that "paying such debt by curtailing municipal services will be dangerous to the public health, safety or education." Officials of the school district testified that, if it is not permitted to borrow the $30,000,000 sought herein, the

schools will have to be closed in May or June, 1981, sometime before the regular end of the school year on June 26, 1981. They further testified as to the dire consequences of such an early school closing. Moreover, we would be inclined to rule that a premature school closing per se is a danger to education. The intervenors, however, offered evidence tending to show that even without the $30,000,000, the school district's cash flow position is such that classes could be kept open until June 19, 1981 and that regardless of when the schools had to be closed, it would be a benefit rather than a danger to education, since it would force the school district to confront its fiscal problems rather than evade them. The intervenors also presented some evidence intended to establish that the school district could avoid an early closing of schools by obtaining additional money from the Commonwealth or the city or by making cuts in expenditures. We were not persuaded by this testimony, which was both speculative and lacking in specificity. We believe that the opinions of the school district officials in this area are entitled to considerable weight and we would not be inclined to make a contrary finding, absent clear and convincing evidence to the contrary.

It was undisputed that it would not be feasible to raise additional revenues through taxation in the current fiscal year.

As to the issue of foreseeability of the school district's current crisis, we believe the evidence is abundantly clear that the circumstances causing the school district to seek to borrow money at this time were foreseeable both at the time of the adoption of its budget on May 29, 1980 and at the time of the adoption of the amended budget on January 26, 1981. Although the testimony and documents at trial contained a plethora of large numbers, we

need here focus on only three. The January 1981 amended budget contains an item of "estimated revenue" as follows:

Intermediate Unit (1980-81)
Additional funds requested          $26,379,000[1]
(from Commonwealth of Pennsylvania)

The amended budget of January 1981 also contains the following items under "changes to revenues":

"Refund of Prior Years' Expenditures:
Increase reflects inclusion of receivables due in previous years representing non-recurring revenue from the Commonwealth for excess costs incurred for operating the Intermediate Unit Special Education Program          8,882,000
"Proceeds:  Refinancing and
Categorical Assistance:
"This new revenue source is a result of refinancing of outstanding long-term debt and categorical funding assistance.          19,464,000"

The first two numbers represent claims against the Commonwealth for moneys expended on mandated special education programs which, by law, the Commonwealth is obliged to fund. The first number is the claim for the present fiscal year beyond what the Commonwealth approved. The second number is unpaid claims for prior years going back to 1975. The crucial fact for our purposes, however, is that it is uncontradicted that the Commonwealth's Department of Education has clearly and unequivocally, both prior and subsequent to the May 1980 budget, indicated its intention not to

---

1. This item in the May 1980 budget was $29,510,000 and in the proposed May 1980 budget was $34,900,000.

pay these items, unless it developed surplus funds. No evidence was presented to indicate that the development of surplus funds is likely any time in the foreseeable future. Indeed, in October 1980 the school district filed suit against the Commonwealth in the Commonwealth Court seeking to recover these items. The case is still in a preliminary stage. Neither in May 1980 nor in January 1981 could any reasonable person have expected that any of these funds would be forthcoming during the current fiscal year. Whether or not they are legally owed to the school district is not the point in the present context. Many a creditor has had debts legally owed, but which he had no reason to believe would ever be paid. It is the foreseeability of receipt of funds, not the foreseeability of legal indebtedness to pay, that is the test contained in the statute.

The third item, "Proceeds: Refinancing and Categorical Assistance $19,464,000," according to the school district's testimony, had its origin at the time of a discussion between city officials and school district officials in September 1980. As part of the resolution of the teachers' strike, city officials suggested that approximately $20,000,000 additional income could become available to the school district by (1) refinancing the school district's long-term obligations, thereby saving $11,000,000 in debt service in the current year, and (2) receipt of approximately $9,000,000 of additional Federal funds for certain programs (referred to as categorical funds) which the city would help the school district obtain. The testimony of the school district was uncontradicted that no action was ever taken by anyone to implement the refinancing. Moreover, there was school district testimony to the effect that the school district was advised by city financial experts at a meeting in December 1980 that the

refinancing could not be done in light of the city's problems with the Commonwealth regarding special education funds. It is our recollection that most of the categorical funds referred to never materialized; however, we will assume, for this purpose, they did.[2] Thus, by January 1981, when the amended budget was adopted, it was clear that at least the $11,000,000 savings on debt service would never materialize. It was foreseeable when the budget was adopted that the school district, because of this particular item, would at some point become at least $11,000,000 short of funds necessary to meet its obligations.

It is apparent on the basis of the special education items and the refinancing item that the school district planned for itself a deficit in the current fiscal year of at least $46,261,000, consisting of:

$26,379,000 (Jan. 1981) Requested additional current Special Education funds

8,882,000 (Jan. 1981) Requested refund of prior years Special Education funds

11,000,000 (Jan. 1981) An unfeasible refinancing plan

The intervenors offered in evidence a copy of a report of the Philadelphia City Controller dated January 21, 1981 entitled "Financial Condition of the School District of Philadelphia." This report stated that the school district would have a deficit at the end of the current fiscal year of $74,900,000. The report specifically refers to the inclusion by the school district in its budget of special education expenses "which the State either refuses to recognize or has not provided funding for." This report by

2. In order that a prompt decision be rendered, this opinion is being written without the benefit of the transcribed notes of testimony of the hearings on March 24 and 25.

the controller was presumably available to the school district when it adopted its revised budget later that month.

We wish to make it clear that we consider the financial plight of the school district very serious. We do not intend that it be inferred from our decision, however, that the school district does or does not need an additional $30,000,000 to keep the schools open until the scheduled end of the school year. Even Solomon in a day-and-a-half hearing could not determine the true financial needs of the school district. (We recognize, of course, that these "true" needs are not only a matter of facts, but also of value judgments.) As we have already indicated, we accept the opinions of the school district officials as to its current needs. As the evidence developed at the hearing before us it became unnecessary for us to hear testimony in depth as to the basis for the school district's fiscal crisis other than the unrealistic budgeting. We neither heard substantial testimony on, nor are we passing upon, alternatives to the borrowing sought. We recognize that the school district is beset with pressures from all sides, especially parents, labor unions, and the state and Federal governments. Its options for resolving its fiscal crisis are limited, inter alia, by parental protests, employment contracts and mandated programs. One option, however, which it does not have is to borrow money without complying with statutory requirements.

Finally, there is an additional aspect of this subject upon which we feel compelled to comment. We believe that public credibility in government is very low. One reason is that governmental matters are often so complex that the average citizen cannot understand them. An even more important reason, in our view, however, is that the public does not

believe that public officials are always honest and straightforward with it. The public collectively cannot address itself to answers to public problems if it is not presented with the right questions. We view the present matter as a case in point. We do not believe that either the May 1980 budget or the January 1981 budget gave the public a true picture of the school district's plight. The hard, perhaps sometimes virtually impossible, problems of balancing a budget cannot be wished away by the inclusion in a budget of unrealistic proposed revenues. Yet, the balancing of budgets is the basic fiscal control required by the law for political subdivisions. Laws requiring balanced budgets are rendered meaningless, if political subdivisions are permitted to adopt budgets which are balanced only on paper and not in reality. The unrealistic budgeting practices of recent school district budgets did not merely technically violate the law; in our view, they also exacerbated an already very difficult fiscal situation. Difficult problems usually require new, imaginative and innovative approaches. It would appear to us that the school district, in recent budgets, rather than confront reality in such a way, has chosen the expedient of burying its fiscal problem, at least to a degree, by the use of unrealistic budgetary figures.

The basic fiscal problem here involved is not just a problem of the school district itself; it is also a problem of the public and certain governmental bodies. The role of the court is only incidental. Whatever solutions for the crisis are proposed, it is the responsibility of the court where issues are raised before it, to insure that the law is complied with. This, we believe, we are doing.

## ORDER

And now, April 1, 1981, the petition of the School District of Philadelphia for leave to fund unfunded debt in the sum of $30,000,000 is denied.